IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| _____ ) | |
| FEDERAL TRADE COMMISSION and ) | |
| STATE OF MAINE, ) | |
| ) | Case No. |
| Plaintiffs, ) | |
| ) | |
| v. ) | **COMPLAINT FOR PERMANENT** |
| ) | **INJUNCTION AND OTHER** |
| HEALTH RESEARCH LABORATORIES, LLC, ) | **EQUITABLE RELIEF** |
| a limited liability company, and ) | |
| ) | |
| KRAMER DUHON, individually and as an owner ) | |
| and officer of HEALTH RESEARCH ) | |
| LABORATORIES, LLC, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Maine, for their

Complaint allege:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse

Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Electronic Fund

Transfer Act, ("EFTA"), 15 U.S.C. §§ 1693-1693r, to obtain permanent injunctive relief,

rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-

gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections

5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, the FTC's Trade Regulation Rule

entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310, and the EFTA and its

implementing Regulation E, 12 C.F.R. § 1005.10 ("Reg. E"), in connection with the labeling,

advertising, marketing, distribution, and sale of products purported to cause weight loss, treat arthritis and relieve joint and back pain, and prevent or mitigate cognitive decline.

2.      The State of Maine brings this action pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A through 214 ("Maine UTPA"), to permanently enjoin and restrain Defendants from engaging in certain unlawful unfair and deceptive acts or practices in the conduct of trade or commerce, and to obtain relief for Defendants' acts or practices in violation of the TSR and the Maine UTPA in connection with the labeling, advertising, marketing, distribution, and sale of products purported to cause weight loss, provide joint pain relief, and prevent or mitigate cognitive decline, such relief to include rescission or reformation of contracts, the refund of monies paid, disgorgement, restitution, civil penalties, other relief as provided in the Maine UTPA, and other equitable relief.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 1693o(c), 6102(c), and 6105(b).

4.      This Court has subject matter jurisdiction over the claims of the State of Maine pursuant to 15 U.S.C. § 6103(a) and supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. §§ 53(b) and 6103(e).

## PLAINTIFFS

6.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also

enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce; the TSR, which prohibits deceptive and abusive telemarketing acts or practices; and the EFTA, which regulates the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.

7.      The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act, the TSR, and the EFTA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  FTC Act, 15 U.S.C. § 53(b), TSR, 15 U.S.C. §§ 6102(c), 6105(b), and the EFTA, 15 U.S.C. § 1693o(c).

8.      Plaintiff State of Maine is one of fifty sovereign states of the United States.  Janet T. Mills is the duly elected and qualified Attorney General acting for Plaintiff State of Maine and is authorized to enforce the Maine UTPA pursuant to 5 M.R.S.A. §§ 191 and 209 and the powers vested in her by common law.

9.      Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Maine is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR and, in each such case, to obtain damages, restitution and other compensation on behalf of Maine residents, or to obtain such further and other relief as the court may deem appropriate.

## DEFENDANTS

10.      Defendant Health Research Laboratories, LLC, ("HRL"), is a Nevada limited liability company.  At all times material to this Complaint, HRL has identified its principal place of business to consumers and businesses as 165 Pleasant Avenue, South Portland, Maine 04106,

which is the location of Ship-Right Solutions, a fulfillment and customer service company for HRL. HRL's inbound telemarketing company, NexRep, is also located in Portland, Maine. In addition, HRL has used the business address of 1000 E. William Street, Suite 204, Carson City, Nevada 89701 and an address in Quebec, Canada to promote its products to Canadian consumers. HRL transacts or has transacted business in this district and throughout the United States and Canada. At all times material to this Complaint, acting alone or in concert with others, HRL has advertised, marketed, distributed, offered for sale, or sold health-related products to consumers throughout the United States and Canada.

11.     Defendant Kramer Duhon ("Duhon") is the President and sole owner of HRL. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of HRL, including the acts and practices set forth in this Complaint. In connection with the matters alleged herein, he transacts or has transacted business in this district and throughout the United States and Canada. Duhon resides in Texas.

## COMMERCE

12.     At all times material to this Complaint, all of the Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and as "trade and commerce" are defined in Section 206(3) of the Maine UTPA, 5 M.R.S.A. § 206(3).

## DEFENDANTS' BUSINESS ACTIVITIES

13.     Defendants have advertised, labeled, offered for sale, sold, or distributed a variety of health-related products, including, but not limited to, BioTherapex Liver Enzyme Rejuvenation ("BioTherapex") and NeuroPlus, from January 1, 2012 to the present.

14.     BioTherapex consists of a combination of vitamins and minerals, as well as bromelain and creatine monohydrate, with a daily serving size of two capsules.  Defendants have sold bottles of BioTherapex for $39.95 each, plus shipping and handling.  Each bottle of BioTherapex contains a one-month supply of capsules.  Defendants also have sold BioTherapex in "Ultra-Intensive," "Super-Intensive," and "Mega-Intensive" multi-pack bundles ranging in price from $79.95 to $119.95, plus shipping and handling.

15.     NeuroPlus contains a proprietary blend of ingredients including bacopa monniera extract, gotu kola powder, blessed thistle herb powder, and gamma aminobutyric acid (GABA), with a daily serving size of two liquid capsules.  Defendants have sold bottles of NeuroPlus for $39.95 each, plus shipping and handling.  Each bottle of NeuroPlus contains a one-month supply of capsules.  Defendants also have sold NeuroPlus in "Silver Deal," "Gold Deal," and "Platinum Deal" multi-pack bundles ranging in price from $79.95 to $189.95, plus shipping and handling.

16.     Defendants have advertised BioTherapex, NeuroPlus, and other products primarily through direct mail brochures to consumers in the United States and Canada. Defendants have also advertised and offered their products for sale on their websites, including, but not limited to, www.hrlsupplements.com and www.biotherapex.com.

17.     To induce consumers to purchase BioTherapex, NeuroPlus, and other products, Defendants have disseminated or caused to be disseminated advertisements and promotional materials, including, but not limited to, the attached Exhibits A through D.  These advertisements contain the following statements and depictions, among others:

**A.  BioTherapex direct mail brochure (Exhibit A):**

**Rheumatism, Arthritis and Osteoarthritis**
Excessive accumulation of toxins attacks your joints and invades your muscles. This process is responsible for pain.  BIOTHERAPEX LIVER REJUVENATION detoxifies your body and stops joint pain and trouble.

5

\* \* \*

If you have one of these ailments, then you must absolutely USE the
BIOTHERAPEX LIVER REJUVENATION free of charge for 30 days and Help
Alleviate . . .
☐ Arthritis
☐ Muscle pain
☐ Joint pain . . .
☐ Rheumatism . . .

\* \* \*

  

### ARTHRITIS, RHEUMATISM

Liver deficiency is one of the root causes of arthritis and rheumatism. Strengthening the liver is one of the best ways to treat arthritis and rheumatism.

From the very first day, you'll notice that the inflammation and the edemas have disappeared; the joint pains have been mitigated. When you wake up you will be stunned at how the rust has gone out of your joints.

Before

24 hours after

In a few weeks of treatment, your rheumatism disappears to never return. Strengthened and reactivated, your liver has expelled the accumulated toxins.

**BIOTHERAPEX LIVER REJUVENATION TREATMENT USED: Super-Intensive treatment**

www.BioTherapex.com   1-888-661-8709   ORDER ANYTIME                    7

\* \* \*

**ARTHRITIS/BACK AND JOINT PAIN**
**"My knees and Lower Back had been torturing me for years".**
Bending or climbing stairs was a living nightmare . . .  There was nothing I could
do but take painkillers that gave me stomach and acid problems.  Since taking
BIOTHERAPEX LIVER REJUVENATION, my pain has completely gone away.
I would never have believed that the cause of pain came from my liver. – Jack R.
(61)

\* \* \*



**Dr. Browning**
Houston, TX
Rheumatologist

**Arthritis, Rheumatism, Back Pain
and Joint Pain**

People whose liver cannot manage to get rid of toxins often suffer from the debilitating effects of Arthritis, Rheumatism and Back Pain.

These toxins can then invade the joint, which subsequently causes the muscles to break down and eventually lose flexibility. Your liver is the body's biggest filter and purifier. If it works well, it gets rid of toxins and waste along with bile.

That's why any rheumatism or arthritis treatment must absolutely go through hepatic therapy.

Even if they provide some form of relief, analgesics and anti-inflammatories are not a long-term solution because they have very negative side-effects and are extremely toxic to the liver.

By suggesting to my patients BIOTHERAPEX LIVER REJUVENATION: They obtain excellent results against joint related diseases (osteoarthritis, rheumatoid arthritis, back pain and even muscle arthritis) and against muscle pain due to fatigued liver... which if not properly addressed can elevate blood toxin levels.

\* \* \*

**Lab photos taken during the clinical study
Here is what you should see in 4 weeks**



Photo 1: Before



Photo 2: 4 weeks after

**RHEUMATISM PAIN, ARTHRITIS**

As I said earlier on, you will feel a net improvement of your pain just 24 hours into your treatment but look at the results after 4 weeks.

Some people who suffered from back pain at the kidney level saw their pain disappear and never return. Look at these before and after photos of the hands following the treatment.

*Photo 1:* The hand is deformed by the inflammation because of rheumatoid arthritis.

*Photo 2:* Little by little, it regains its initial shape and all traces of the inflammation disappear; the patient no longer suffers.

**BIOTHERAPEX LIVER REJUVENATION TREATMENT USED: Super-Intensive treatment**

\* \* \*

**Lab photos taken during the clinical study
Here is what you should see in 24 hours**



Before



24 hours after

**FLATTER BELLY, WEIGHT LOSS**

You won't need more than just 2 days to see the difference!

After just 2 days of treatment you will definitely feel slimmer. Your stomach is flat and you won't feel bloated after a meal.

You have slimmed down all over, including feet, hands and the face. You feel lighter and rejuvenated.

If you get on the scale, you will be awed at having lost at least 4.5lbs in 48 hours without having done anything special... Nothing better than over-activating your liver to lose pounds and enhance your line.

**BIOTHERAPEX LIVER REJUVENATION TREATMENT USED: Super-Intensive treatment**

**BIOTHERAPEX LIVER REJUVENATION TREATMENT USED: Ultra-Intensive treatment**



Before



4 weeks after

### OVERWEIGHT

You could easily lose between 8-13lbs. per week. In just two-weeks, this woman lost over 28lbs. without dieting, without medication, without effort; just by feeding her liver with BIOTHERAPEX LIVER REJUVENATION.

**How:** Her liver is working at optimal capacity making all her organs more efficient. Calories are quickly turned into energy and not into fat. As the body quickly uses its fat reserves – you lose weight quickly!

BIOTHERAPEX LIVER REJUVENATION TREATMENT USED: **Mega-Intensive treatment**

\* \* \*



### WEIGHT LOSS

**I lost 20lbs by doing nothing.**

"I was a few months into my diet and the weight was not coming off despite all I did... But everything changed when I started taking BIOTHERAPEX LIVER REJUVENATION....

At the end of the very first week, I had already lost 12lbs. even though I did not change my diet nor did I do any more exercise. I have now lost 28lbs. Effortlessly."

- Beth G. (47)

\* \* \*



## "Your Liver Is A Master Organ And In Many Ways Is Much More Important Than Your Heart."

- Dr. A. Schreiner

Chronic fatigue, depression, nervousness, migraines, acid reflux, poor memory, kidney disease, pancreatitis, eczema, abnormal weight gain, cholesterol, diabetes, arthritis, rheumatism, night cramps, allergies... **and the list goes on...**

# Your Health Depends On The Health Of Your Liver.



*San Diego Medical Conference saw the participation of 200 specialists from 14 countries.*

During a notable San Diego Hepatology Conference, over 200 specialists from 14 countries debated the scope of the results of a recent study on the Liver.

The study was carried out on over 1200 people with various afflictions: hypertension, chronic fatigue syndrome, joint and muscle pain, sexual difficulties, diabetes, kidney function, memory trouble, depression, obesity, digestive problems, IBS, skin conditions, etc.

Through a series of tests and analyses, this study showed that well over 140 diseases are caused by liver dysfunction.

## The Testing Criteria

The 1200 chosen individuals were divided into 4 test groups: 3 groups of 300 people were given blind treatment for a period of 14, 30 or 60 days, intended to reactivate their liver functions, while the last group,

300 people, received a placebo for the same period of time.

The results amazed the entire conference! In fact, among the 4 groups receiving the treatment, only one group of 300 people, showed stunning results. This group was the only group benefiting from the brand new liver reactivation protocol called BIOTHERAPEX LIVER REJUVENATION.

In just this group alone, all the tests subjects saw their affliction symptoms recede rapidly and some disappear completely.

BIOTHERAPEX LIVER REJUVENATION leaves the winner!

## 99% satisfaction.

\* \* \*



**Dr. Abrodovich** Minneapolis, MN
Gastroenterology

## Digestive problems:

Digestive difficulties, stomach pain and heart-burn are the first symptoms to show up in the event of liver problems.

I suggest to my patients BIOTHERAPEX LIVER REJUVENATION first and foremost as a natural remedy for digestive problems.

**I FEEL LIKE A NEW MAN!**
Job Issues, moving, and a bad breakup...I had to face everything head on and have been feeling really drained and unable to recover...My mood and my physical shape had both taken a big hit. BIOTHERAPEX LIVER REJUVENATION allowed me to regain my energy and all my abilities. It only took four days and I was my old self again! I have renewed energy and get great pleasure out of doing things. It's a true cure that everyone should try; that's how effective and fast it is!  - Bob M. (52)



**B.  NeuroPlus direct mail brochure (Exhibit B)**

PERIODICAL OF NEW MEMORY FRONTIERS                    Special Issue
ADVANCED MEMORY DISCOVERIES                    Vol 1 Issue 3

Incredible Memory Boosting / Restoring Secrets Found
in Himalayas, Mediterranean and Australia
Now Combined into One Capsule!

# REVERSE MEMORY LOSS

Men & Women, Even into their 80s and 90s [sic] Report it protects your brain against Alzheimer's[,] boosts your mood, and sharpens your concentration . . .

- **Medical Discovery #1:**
  This Powerful Phytonutrient
  Protects Brain Against
  The Ravages of Alzheimer's
  & Dementia . . .

- **Medical Discovery #2:**
  New Advancement Boosts
  Memory, Attention &
  Rebuilds Brain Power in
  People Over Fifty . . .

- **Medical Discovery #3:**
  New Weaponry in
  War Against Depression,
  Alzheimer's & Dementia . . .

- **Medical Discovery #4:**
  Nourish You [sic] Brain with
  These Pharmaceutical Grade Ingredients & Have
  Supercharged Memory &
  Concentration . . .

* * *

### Medical Journals Praise Gotu Kola



*Journal of Naturo-Pharmacology:* Gotu kola eased "age related cognitive function and mood disorder in the elderly". Participants received Gotu kola for 2-months. Scientists assessed their cognitive performance using the computerized test battery and the Bond-Lader scales before the trial, and 1 and 2 months after treatment. *The Results: Scientists concluded that Gotu kola enhanced working memory and elevated mood compared to control group taking a placebo.*



*Journal of Neuroscience Research:* Gotu kola given to rats after a stroke. *The Results: Researchers discovered Gotu kola reduced the damage of a stroke by 60% on day 1 and by 26% on day 7 – and improved neurological outcome 24 hours after the stroke.*

In a secondary study researchers gave Gotu kola to rats and found *"it protected the brain from oxidative damage that leads to dementia and Alzheimer's."*

And this study published by *The National Institutes of Health* prove Gotu kola's mind-sharpening effects:



Gotu kola *"Prevents amyloid plaque formation in Alzheimer's disease, and decreases oxidative stress."* Since plaque build-up triggers Dementia and Alzheimer's, this study offers hope to millions suffering with this debilitating illness.

The good news is *you don't have to have a stroke* in order to receive the full benefits of Gotu Kola. Healthy brains benefit from it as well!

* * *

"The research on Gotu kola and water Hyssop is so amazing we knew we had to make it available to the public. So we gathered up the team of chemists at HRL and created **NeuroPlus** the leading nutritional supplement for memory, focus and brain longevity."

* * *

**"No More Embarrassing Moments With The Family . . ."**
I have a large family. A few years ago, I couldn't even remember my kids' names, not to mention my grandkids! Then I started taking **NeuroPlus**. Thank you **NeuroPlus**!" – *P.B., Seattle.*

11

\* \* \*

**"No more strings around my fingers…no more index cards around the house…"** I am an old-fashioned person. I used string or ugly index cards to help my memory.  Now I use **NeuroPlus** to keep my memory – and my mind – as sharp as a tack!"  *D.B.C., Texas*

\* \* \*

**1 Family: 3 Generations; And We All Take NeuroPlus!** "I started taking **NeuroPlus** when I noticed I was having more 'senior moments' than normal. At 76 my memory has never been better.  Then my son told me that his Doc wanted to put Sam, my grandchild, on an Rx drug for better focus and attention at school. I suggested he use something more natural before resorting to prescription drugs. I am glad I did. He's been taking **NeuroPlus** and said he has noticed a difference in the level of attention he can give to class – and his grades prove it! Now my son, my grandson and me – that is 3 generations – take **NeuroPlus** daily! Thanks! –*K.T.W., Nevada*

\* \* \*



### C.   BioStem direct mail brochure (Exhibit C)



### "Black Spots from Age-Related Macular Degenerative Disease Shrunk"

"…I did not think that **BioStem** could help with my macular degeneration… however, in as little as 4 weeks the black spot has shrunk! All I did was just add **BioStem** with my usual vitamins… I can't believe it! I hope it will shrink even more!" - *Charlotte S. (Tampa)*

### "Got Off Anti-Depressants and Dropped Over 40 Pounds!"



"I was taking a cocktail of anti-depressants… most days, I could not function from the side effects. As a result of these anti-depressants, I went from a size 8 to a size 18 in six months. I tried for 2 years to get the weight off. Nothing happened. After just a few days of taking **BioStem**, my mood just lifted… Two weeks later, I had dropped 12 pounds, with a total of 40 pounds in 3 months. I haven't been on any medication for depression since." - *Carla T. (Austin)*



### "Shrunk My Prostate and Increased My Sexual Vigor!"

"I am 82 years old this year and my doctor told me I had the prostate of a man in his 30's! The only change I have made was to add **BioStem**! I feel great and I'm a little bit embarrassed to tell you this but I now have more erections in the morning… who would have thought! I'm not complaining… and neither is my wife!" - *Julius S. (Detroit)*

### "Improved My Heart Function Significantly"



"I had two heart attacks and two triple bypass operations. My heart had become steadily weaker over the years. I started taking **BioStem** as a part of my wellness therapy and within a matter of months; I was able to do things I could only dream of doing before, such as walking up and down stairs or even playing golf. I feel 100 times better. It could have only been your treatment that reacted… I haven't changed or added anything else since starting **BioStem**. **BioStem** may have given me years I never thought I would have. Thank you" - *Gary A (Oxnard)*

\* \* \*



Prof. Geoffrey Cambridge
Microbiologist, Queens College

## For 18 years Professor Geoffrey Cambridge has been prescribing AFA for his patients in his private practice shares the following…

*"… As a Microbiologist, I was well aware of stem cells. In 1994, I had the honor of meeting Professor Rick Cohen who touted the benefits of BioStem Capsules. Of course, back then they were only available in pill form. The results were up to par with the scientific test conclusions. In 18 years, I have seen it work within patients and people with various Neurological Disorders… The ingredients in BioStem has helped regenerate eyes, muscle junction, livers, arteries, hearts, lungs …and has even helped with acute depression."*

### WITHOUT ANY SIDE EFFECTS OR CONTRA-INDICATION

The reason is very simple. AFA is a stimulant, a promoter that facilitates the production and circulation of your own stem cells. Why would your body want to suddenly reject your own cells?

In 2010, Professor Cohen presented me with **BioStem BioCap** Technology, even more complete than gels or pills. The results that I used to get in only 28 days, which is unheard of, are now seen in half that time with **BioStem Capsules.**

As a doctor, I highly recommend that you give BioStem Capsules a try. In less than one week you will feel a change, you'll feel younger, with more energy…After a short time, your health problems will become a thing of the past. Your doctor will not believe the changes, guaranteed!

D.     **Betarol direct mail brochure (Exhibit D)**

**Order *Betarol* Today! And see results fast!**



"I got up in the middle of the night to urinate several times a night before I discovered *Betarol*. Now, I snooze completely through the night without having to urinate even once. I almost forgot what it was like to sleep all night with no interruptions. I feel fantastic, thanks to *Betarol*!"

John F. — *Laguna Hills, California*



"At the age of 66, I suffered from an enlarged prostate for nearly ten years. For a long time, I took a prescription remedy, which worked okay, not great! It definitely affected my sex life. Now, after using *Betarol*, my prostate is normal and I have sex again like a teenager. It has brought me great comfort not to mention the savings over Rx costs!"

Thomas K. — *Lafayette, LA*



"I was having big problems every time I had to urinate. Even when I really had to go badly, it often wouldn't 'start.' This was not good. A good friend told me about your formula. I purchased it, doubled the dose, and within a couple of days, I was able to urinate easily. I highly recommend *Betarol* to any man. It worked wonders for me!"

Sol A. — *Chicago, IL*



"I've been using *Betarol* for only two weeks, and it is working wonders! No more getting up at night to pee. Now, I sleep through the night. I've had prostate problems for at least fifteen years and finally have found something that works!"

Wayne H. — *Smithdale, MS*

**Try Betarol  risk-free and in no time you'll feel better!**

✔ Improved bladder control for more restful nighttime sleep
✔ Enhanced sexual performance, more vigorous erections
✔ More energy on-demand, increased sense of well-being

18.     Defendants' advertisements, including Exhibits A through D, contain consumer testimonials and expert endorsements that are fictitious.

### DEFENDANTS' MARKETING PRACTICES

19.     Consumers can purchase Defendants' products either by mailing in their order to Defendant HRL's South Portland, Maine address, calling the toll-free numbers printed on product brochures, or accessing Defendants' product websites.

14

20.     Direct mail brochures for BioTherapex have offered consumers a "free 60-day trial" or a "free 30-day trial."  Defendants encourage consumers to take the free trial "just out of curiosity since it's risk-free; don't pay a single penny if you're not thrilled with the results!"

21.     Direct mail brochures for NeuroPlus have offered consumers a "60 day no risk free trial," claiming "The Only Thing You Will Lose Will Be Your 'Senior's [sic] Moments.' There are no strings to this 60-day **FREE TRIAL OFFER**.  We send **NeuroPlus** right to your door, so you can feel it work in as little as 60 days."  (Ex. B, pages 8-9).

22.     When consumers call to order the free trial, they are first asked for their contact information and their charge card number prior to any discussion about purchasing products.  Defendants then attempt to switch consumers to a one-year supply, which they represent as their most popular option.  Defendants typically assure consumers they will have sixty days to try the products they are purchasing and that they will receive their money back if they are not satisfied.

23.     In many instances, Defendants fail to disclose, or fail to disclose adequately, to consumers that the free trial begins on the date their orders are placed, shortening the trial period.  In addition, product shipments often take 10-14 business days to arrive, further shortening the trial period.  As a result, consumers frequently discover that their trial period ended earlier than promised.

24.     In many cases, when consumers call to order Defendants' products, Defendants enroll them in an auto-renewal program without disclosing, or adequately disclosing, that they are doing so.  In other cases, Defendants offer consumers an auto-renewal program with the promise of free shipping and the opportunity to customize or discontinue the plan anytime.  In some cases Defendants enroll consumers in auto-renewal programs after consumers specifically request not to be included in the program.  Defendants do not tell consumers that these auto-

renewal shipments, which begin before the trial period ends, are non-refundable.  As a result of this, consumers are frequently charged for auto-renewal shipments they do not want.

25.     Defendants typically instruct their customer service agents to refuse customer refunds requested more than sixty days after order dates and to deny requests for refunds on auto-renewal shipments.  Even if consumers call to request refunds within the required time, they discover a number of previously undisclosed conditions for receiving refunds, such as not being refunded the cost of the initial shipping and handling, that they must call to obtain a return merchandise authorization number, that they must bear the cost of returning and tracking all opened and unopened merchandise, and that the merchandise must be received by Defendants before the end of the trial period.  In some cases, consumers who follow all of Defendants' conditions for receiving refunds still do not receive refunds.

26.     Defendants also mail product brochures to Canadian consumers from a Quebec address, 7107 Rte. Transcanadienne, #414, St. Laurent, QC H4T 1A2.  The brochures display this Canadian address, but do not disclose that product prices are in U.S. dollars rather than Canadian dollars, or that products are shipped from the United States.  When Canadian consumers call to purchase products, identifying their Canadian addresses to Defendants prior to placing their orders, Defendants do not tell these consumers that Defendants are quoting prices in U.S. dollars, not Canadian dollars, and will bill consumers' charge cards in U.S. dollars. Defendants similarly do not warn Canadian consumers that products will be shipped from the United States, such that consumers must pay substantial customs duties and import taxes at the time of delivery.

**Defendants' Offers on Behalf of Third Parties**

27.     Once consumers accept Defendants' primary offer (*e.g.*, BioTherapex or

NeuroPlus), Defendants' inbound sales representatives offer consumers "upsells" in the form of

additional goods and services sold by third parties ("external upsells").  Defendants receive

commissions when consumers accept free or low-cost trial offers for these additional goods and

services, which are typically auto-renewal savings club memberships.  Defendants promise

incentives such as rebates, gift cards, and gas vouchers if callers will participate in their buying

clubs on a trial basis.  In numerous instances, Defendants have failed to disclose all material

terms and conditions for these upsells, including the identity of the third parties providing the

products or services and clear instructions on how to cancel these offers.

**Failure to Obtain Authenticated Authorization Under Regulation E
in Advance of Charging Debit Cards**

28.     Defendants obtain debit card numbers from many consumers with the intention of

charging them for auto-renewal plans but fail to obtain consumers' written or other similarly

authenticated authorization in advance that describes the terms of the preauthorized transfer in a

clear and understandable form.

## VIOLATIONS OF THE FTC ACT

29.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

30.     Misrepresentations or deceptive omissions of material fact constitute deceptive

acts or practices prohibited by Section 5(a) of the FTC Act.

31.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are

likely to cause substantial injury to consumers that consumers themselves cannot reasonably

avoid and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

32.     For purposes of Section 5(a) of the FTC Act, the term "unfair or deceptive acts or practices" includes acts or practices involving foreign commerce that involve material conduct occurring within the United States.  All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available, including restitution to domestic or foreign victims.  15 U.S.C. § 45(a)(4).

33.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, BioTherapex and NeuroPlus are "drugs," as defined in Section 15(c) of the FTC Act, 15 U.S.C. § 55(c).  The term "false advertisement" means an advertisement, other than labeling, which is misleading in a material respect.  15 U.S.C. § 55(a)(1).

## COUNT I

### Defendants' False or Unsubstantiated Claims About BioTherapex

34.     Through the means described in Paragraph 17, including, but not limited to, the statements and representations contained in the advertisement attached as Exhibit A, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.    BioTherapex treats or cures rheumatism, arthritis, and osteoarthritis;

    b.    BioTherapex relieves joint pain, back pain, and muscle pain;

    c.    BioTherapex relieves back pain and pain associated with rheumatism and arthritis in four weeks; and

d.     BioTherapex causes weight loss without dieting or exercising, including as much as twenty-eight pounds in two weeks and eight to thirteen pounds per week.

35.     The representations set forth in Paragraph 34 are false or misleading, or were not substantiated at the time the representations were made.  Therefore, the making of the representations set forth in Paragraph 34 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT II

### Defendants' False or Unsubstantiated Claims About NeuroPlus

36.     Through the means described in Paragraph 17, including, but not limited to, the statements and depictions contained in the advertisement attached as Exhibit B, Defendants have represented, directly or indirectly, expressly or by implication, that:

a.     NeuroPlus protects the brain against Alzheimer's disease and dementia;

b.     Neuroplus reverses memory loss; and

c.     NeuroPlus improves memory, concentration, and cognitive performance.

37.     The representations set forth in Paragraph 36 are false or misleading, or were not substantiated at the time the representations were made.  Therefore, the making of the representations set forth in Paragraphs 36 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT III

### Defendants' False Claims that NeuroPlus Is Scientifically Proven

38.     Through the means described in Paragraph 17, including, but not limited to, the statements and depictions contained in the advertisement attached as Exhibit B, Defendants have represented, directly or indirectly, expressly or by implication, that NeuroPlus is scientifically proven to:

> a.     Protect the brain against Alzheimer's disease and dementia;
>
> b.     Reverse memory loss; and
>
> c.     Improve memory, concentration, and cognitive performance.

39.     The representations set forth in Paragraph 38 are false or misleading.  Therefore, the making of the representations set forth in Paragraph 38 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT IV

### False Proof Claim About BioTherapex

40.     Through the means described in Paragraph 17, Defendants have represented, directly or indirectly, expressly or by implication, that the 1200-person clinical study presented in Exhibit A proves BioTherapex eliminates or reduces the symptoms associated with hypertension, chronic fatigue syndrome, joint and muscle pain, diabetes, depression, obesity, and IBS.

41.     The representation set forth in Paragraph 40 is false or misleading because no study has been conducted on BioTherapex.  Therefore, the making of the representation set forth in Paragraph 40 of this Complaint constitutes a deceptive act or practice and the making of false

20

advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT V

### False Advertising Claims Through Consumer and Expert Endorsers

42.     Through the means described in Paragraph 17, Defendants have represented, directly or indirectly, expressly or by implication, that the product users depicted in their advertising were actual persons who had successfully used Defendants' products.

43.     Through the means described in Paragraph 17, Defendants have represented, directly or indirectly, expressly or by implication, that the experts depicted in their advertising were actual medical professionals who recommended using Defendants' products.

44.     The representations set forth in Paragraphs 42 and 43 are false or misleading because the purported product users and experts depicted in Defendants' advertising were fictitious.  Therefore, the making of the representations set forth in Paragraphs 42 and 43 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT VI

### False Risk-Free Trial Offer

45.     Through the means described in Paragraphs 20 through 25, Defendants have represented to consumers, directly or indirectly, expressly or by implication, that they could try Defendants' products, including, but not limited to, BioTherapex and NeuroPlus, risk-free without incurring any financial obligation.

46.     The representation in Paragraph 45 is false or misleading because Defendants required consumers to pay:  the cost of the initial shipment, which was not refundable; the cost of returning both full and empty bottles of the product; the full cost of Defendants' products, including, but not limited to, BioTherapex and NeuroPlus, if consumers did not follow the undisclosed or inadequately disclosed return and refund policies described in Paragraph 25; and additional charges for inadequately disclosed auto-renewal shipments of Defendants' products, including, but not limited to, BioTherapex and NeuroPlus.

47.     Therefore, the making of the representation set forth in Paragraph 45 constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Misrepresentation About the Length of the Trial Offer

48.     Through the means described in Paragraphs 20 through 25, Defendants have represented to consumers, directly or indirectly, expressly or by implication, that they could try Defendants' products, including, but not limited to, BioTherapex and NeuroPlus, free for 30 or 60 days.

49.     The representation in Paragraph 48 is false or misleading.  Consumers could not try Defendants' products, including, but not limited to, BioTherapex or NeuroPlus, free for 30 or 60 days because Defendants calculate the trial period beginning on the date consumers place their orders, which, as described in Paragraph 23, is generally 10 to 14 days before consumers receive their products.  In addition, Defendants require consumers to ensure that Defendants receive any returned merchandise before the end of the 30- or 60-day trial period.  Therefore, consumers have far less time than the promised 30 to 60 days to try the products.

50.     Therefore, the making of the representation set forth in Paragraph 48 constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VIII

### Misrepresentation of the Price for Goods Sold

51.     In numerous instances, Defendants have represented to Canadian consumers, directly or indirectly, expressly or by implication, that the price for goods sold was the total cost delivered.

52.     The representation set forth in Paragraph 51 is false or misleading.  The price for goods sold was not the total cost delivered.  Rather, Defendants' Canadian consumers are required by law to pay substantial customs duties, and the price for goods was advertised only in U.S. dollars, rather than in Canadian dollars.

53.     Therefore, the representation set forth in Paragraph 51 constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IX

### Unfairly Charging Consumers Without Authorization

54.     In numerous instances, Defendants have caused charges to be submitted for payment to the credit and debit cards of consumers without the express informed consent of those consumers.

55.     Defendants' acts or practices set forth in Paragraph 54 cause or are likely to cause substantial injury to consumers that those consumers cannot reasonably avoid themselves and that injury is not outweighed by countervailing benefits to consumers or competition.

23

56.     Therefore, Defendants' acts or practices set forth in Paragraph 54 constitute unfair acts or practices, in or affecting commerce, in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## THE TELEMARKETING SALES RULE

57.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

58.     Defendants are "sellers" and/or "telemarketers" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  The TSR generally exempts "[t]elephone calls initiated by a customer . . . in response to a direct mail solicitation," 16 C.F.R. § 310.6(b)(6).  However, this exemption does not apply to "any instances of upselling" during those telephone calls.  § 310.6(b)(6).

59.     "Upselling" is defined by the TSR as "soliciting of the purchase of goods or services following an initial transaction during a single telephone call.  The upsell is a separate telemarketing transaction, not a continuation of the initial transaction."  16 C.F.R. § 310.2(ee).

60.     The TSR prohibits sellers and telemarketers from failing to disclose truthfully, in a clear and conspicuous manner, before a customer consents to pay for goods or services offered, the following material information:  (a) the total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer; and (b) if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy.  16 C.F.R. § 310.3(a)(1)(i), (iii).

24

61.     Additionally, the TSR requires sellers or telemarketers in an internal or external upsell to disclose truthfully, promptly, and in a clear and conspicuous manner the following information:

        a.     The identity of the seller;

        b.     That the purpose of the call is to sell goods or services; and

        c.     The nature of the goods or services.

16 C.F.R. § 310.4(d)(1), (2), and (3).

62.     The TSR prohibits sellers and telemarketers from "[c]ausing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer . . . ."  16 C.F.R. § 310.4(a)(7).

63.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

**COUNT X**

**Failure to Disclose Material Terms and Conditions of Refund and Cancellation Policy
Both Plaintiffs**

64.     In numerous instances, in connection with Defendants' efforts to add external upsells of discount buying clubs described in Paragraph 27, and before a customer consents to pay for goods or services, Defendants represent they will honor requests for refunds and cancellations but fail to disclose truthfully, and in a clear and conspicuous manner, a statement of all material terms and conditions of such refund or cancellation policy.

25

65.     Defendants' acts or practices, as described in Paragraph 64, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(iii).

## COUNT XI

### Failure to Make Required Oral Disclosures
### Both Plaintiffs

66.     In numerous instances, in connection with Defendants' efforts to externally upsell discount buying clubs, as described in Paragraph 27, they fail to disclose promptly and in a clear and conspicuous manner to consumers the identity of the third-party seller.

67.     Defendants' acts or practices, as described in Paragraph 66, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(d)(1).

## VIOLATIONS OF EFTA AND REGULATION E

68.     Section 907(a) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."  Section 903(10) of EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

69.     Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."

70.     Section 1005.10(b) of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization."  *Id*. ¶ 10(b),

26

cmt. 5.  The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable."  *Id.* ¶ 10(b), cmt. 6.

71.     Pursuant to Section 917(c) of EFTA, 15 U.S.C. § 1693o(c), every violation of EFTA and Regulation E constitutes a violation of the FTC Act, 15 U.S.C. §§ 41 et seq.

## COUNT XII

### EFTA and Regulation E

72.     In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

73.     In numerous instances, Defendants debit consumers' bank accounts on a recurring basis without providing to the consumer a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby violating Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

74.     By engaging in violations of EFTA and Regulation E set forth in Paragraphs 72 and 73, Defendants have engaged in violations of 15 U.S.C. § 1693o(c) and the FTC Act, 15 U.S.C. §§ 41 et seq.

## VIOLATIONS OF MAINE LAW

75.     The Maine UTPA, § 207, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

27

76.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 207 of the Maine UTPA.

77.     Acts or practices are unfair under Section 207 of the UTPA if they cause or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition.

78.     Section 206 of the Maine UTPA defines "trade" or "commerce" as including "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State."  5 M.R.S.A. § 206.

79.     Chapter 205-A, "Required Disclosures to Consumers," of Title 10 of Maine's statutes prohibits certain practices related to free trial offers.  10 M.R.S.A. §§ 1210 through 1210-B.

80.     Section 1210(2) prohibits making free offers unless, at the time of the offer, "the seller provides the consumer with clear and conspicuous information regarding the terms of the free offer, including any additional financial obligations that may be incurred as a result of accepting the free offer."  10 M.R.S.A. § 1210.

81.     Section 1210-A provides that a violation of Title 10, Chapter 205-A is a violation of the Maine UTPA.

## COUNT XIII

### Defendants' False or Unsubstantiated Claims About BioTherapex

82.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 34 of this Complaint.

83.     The representations set forth in Paragraph 34 are false or misleading, or were not substantiated at the time the representations were made.  Therefore, the making of the representations set forth in Paragraph 34 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

84.     Defendants' conduct, as described herein, has been intentional.

**COUNT XIV**

**Defendants' False or Unsubstantiated Claims About NeuroPlus**

85.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 36 of this Complaint.

86.     The representations set forth in Paragraph 36 are false or misleading, or were not substantiated at the time the representations were made.  Therefore, the making of the representations set forth in Paragraph 36 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

87.     Defendants' conduct, as described herein, has been intentional.

**COUNT XV**

**Defendants' False Claims that NeuroPlus Is Scientifically Proven**

88.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 38 of this Complaint.

89.     The representations set forth in Paragraph 38 are false or misleading.  Therefore, the making of the representations set forth in Paragraph 38 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

90.     Defendants' conduct, as described herein, has been intentional.

**COUNT XVI**

**False Proof Claim About BioTherapex**

91.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 40 of this Complaint.

92.     The representation set forth in Paragraph 40 is false or misleading because no study has been conducted on BioTherapex.  Therefore, the making of the representation set forth in Paragraph 40 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

93.     Defendants' conduct, as described herein, has been intentional.

**COUNT XVII**

**False Advertising Claims Through Consumer and Expert Endorsers**

94.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraphs 42 and 43 of this Complaint.

95.     The representations set forth in Paragraphs 42 and 43 are false or misleading because the purported product users and experts depicted in Defendants' advertising were fictitious.  Therefore, the making of the representations set forth in Paragraphs 42 and 43 of this Complaint constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

96.     The conduct of the Defendants, as described herein, has been intentional.

**COUNT XVIII**

**False Risk-Free Trial Offer**

97.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 45 of this Complaint.

98.     The representation set forth in Paragraph 45 is false or misleading because Defendants required consumers to pay:  the cost of the initial shipment, which was not refundable; the cost of returning both full and empty bottles of the product; the full cost of products, including, but not limited to, BioTherapex and NeuroPlus, if consumers did not follow the undisclosed or inadequately disclosed return and refund policies described in Paragraph 25; and additional charges for inadequately disclosed auto-renewal shipments of the products, including, but not limited to, BioTherapex and NeuroPlus.  Therefore, the making of the representation set forth in Paragraph 45 of this Complaint constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207 and 10 M.R.S.A. § 1210.

99.     The conduct of the Defendants, as described herein, has been intentional.

## COUNT XIX

### Misrepresentation About the Length of the Trial Offer

100.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 48 of this Complaint.

101.     The representation set forth in Paragraph 48 is false or misleading.  Consumers could not try Defendants' products, including, but not limited to, BioTherapex or NeuroPlus, free for 30 or 60 days because Defendants calculate the trial period beginning on the date consumers place their orders, which, as described in Paragraph 23, is generally 10 to 14 days before consumers receive their products.  In addition, Defendants require consumers to ensure that Defendants receive any returned merchandise before the end of the 30- or 60-day trial period.  Thus, consumers have far less time than the promised 30 to 60 days to try the products.  Therefore, the making of the representation set forth in Paragraph 48 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207 and 10 M.R.S.A. § 1210.

31

102.    The conduct of Defendants, as described herein, has been intentional.

## COUNT XX

### Misrepresentation of the Price for Goods Sold

103.    Plaintiff State of Maine incorporates herein by reference all of the allegations

contained in Paragraph 51 of this Complaint.

104.    The representation set forth in Paragraph 51 is false or misleading.  The price for

goods sold was not the total cost delivered.  Rather, Defendants' Canadian consumers are

required by law to pay substantial customs duties, and the price for goods was advertised only in

U.S. dollars, rather than in Canadian dollars.  Therefore, the making of the representation set

forth in Paragraph 51 constitutes a deceptive act or practice in the conduct of trade or commerce,

in violation of 5 M.R.S.A. § 207 and 10 M.R.S.A. § 1210.

105.    The conduct of Defendants, as described herein, has been intentional.

## COUNT XXI

### Unfairly Charging Consumers Without Authorization

106.    Plaintiff State of Maine incorporates herein by reference all of the allegations

contained in Paragraphs 54 and 55 of this Complaint.

107.    Therefore, Defendants' acts or practices set forth in Paragraph 54 constitute unfair

acts or practices in the conduct of trade or commerce by charging the debit and credit cards of

consumers without the consumers' express informed consent, in violation of 5 M.R.S.A. § 207

and 10 M.R.S.A. § 1210.

108.    The conduct of Defendants, as described herein, has been intentional.

## CONSUMER INJURY

109.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the EFTA, the Maine UTPA, and  10 M.R.S.A. § 1210.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

110.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC, including the Telemarketing Act, the TSR, the EFTA, and Reg. E.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

111.    Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt violations of the TSR and to redress injury to consumers, including the award of damages, restitution, or other compensation in an action brought by a state.

112.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Maine to enforce its state law claims under the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-a through 214, against Defendants in this Court.  Section 209 of the Maine UTPA empowers this Court to grant injunctive and such other relief, including civil penalties for intentional violations, as the Court may deem appropriate to halt and redress

violations of any provision of the UTPA enforced by the Maine Attorney General.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of the UTPA enforced by the Maine Attorney General.

## FTC PRAYER FOR RELIEF

Wherefore, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 917(c) of the EFTA, 15 U.S.C. §1693o(c), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the EFTA and its implementing Reg. E by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff FTC the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

## MAINE PRAYER FOR RELIEF

Wherefore, Plaintiff State of Maine, pursuant to Section 4(a) of the Telemarketing Act, 15 U.S.C. § 6103(a), Section 209 of the Maine UTPA, 5 M.R.S.A. § 209, and the Court's own equitable powers, requests that the Court:

A.    Enter an order declaring Defendants' above-described conduct to be in violation of the TSR and the Maine UTPA, § 207, and to be intentional violations pursuant to the Maine UTPA, § 209;

B.    Enter a permanent injunction to prevent future violations of the TSR and the Maine UTPA by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR and the Maine UTPA, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.    Adjudge civil penalties of not more than ten thousand dollars ($10,000) for each intentional violation of the Maine UTPA pursuant to 5 M.R.S.A. § 209; and

E.    Award Plaintiff State of Maine the costs of bringing this action, prejudgment interest pursuant to 14 M.R.S.A. § 1602-B, and such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

/s/ Elizabeth K. Nach
Elizabeth K. Nach
James A. Prunty
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Telephone: 202-326-2611, -2438
Facsimile:  202-326-3259
Email: enach@ftc.gov;
          jprunty@ftc.gov


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

JANET T. MILLS
Attorney General, State of Maine

/s/ Brendan F.X. O'Neil
Brendan F.X. O'Neil
Linda J. Conti
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333
Telephone: 207-626-8842, -8591
Facsimile: 207-624-7730
Email: brendan.oneil@maine.gov;
          linda.conti@maine.gov


Attorneys for Plaintiff
STATE OF MAINE