UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2:17-cv-00467-JDL ) |
| HEALTH RESEARCH LABORATORIES, LLC, et al., | ) ) ) |
| Defendants. | ) |

## ORDER

The Federal Trade Commission and the State of Maine (collectively, "Plaintiffs") bring this civil contempt proceeding against Health Research Laboratories, LLC, Kramer Duhon, and Whole Body Supplements, LLC (collectively, "Contempt Defendants"), for alleged violations of Section II.H of the Stipulated Final Judgment and Order previously entered in this action ("the Judgment"). In addition to moving for an Order to Show Cause (ECF No. 21), the Plaintiffs move to modify the Judgment (ECF No. 22). Health Research Laboratories and Duhon cross-move to modify the Judgment (ECF No. 30), and the Contempt Defendants move to stay the contempt proceedings until the cross-motions to modify the Judgment are resolved (ECF No. 31). Pursuant to my orders dated April 1 and April 8, 2020, I now address the threshold question of whether Section II.H of the Judgment is ambiguous on its face as a matter of law. For the reasons explained below, I conclude that Section II.H is facially ambiguous.

1

## I. BACKGROUND

In a complaint dated November 30, 2017, the Plaintiffs alleged that Duhon and his company, Health Research Laboratories, made deceptive health- and disease-related claims about several products, including the dietary supplements BioTherapex and NeuroPlus. On January 16, 2018, with the consent of the parties, I approved and entered the Judgment. The Court retained jurisdiction for purposes of construing, modifying, and enforcing the Judgment.

The Judgment resolved all matters in dispute in the underlying action, including the complaint's allegations that Duhon and Health Research Laboratories violated state and federal law "in connection with the labeling, advertising, marketing, distribution, and sale of products purported to cause weight loss, treat arthritis, relieve joint and back pain, and prevent or mitigate cognitive decline." ECF No. 15 at 2. The Judgment prohibits Health Research Laboratories, Duhon, and "officers, agents, employees, and all other persons in active concert or participation with any of them, who receive actual notice" of the Judgment, from making several categories of representations. *E.g.*, *id.* at 6. For example, Section I, entitled "Banned Weight-Loss Claims," prohibits seven specific representations about certain products' ability to cause weight loss in consumers. *Id.*

Section II is entitled "Prohibited Representations: Other Weight-Loss Claims, Joint-Related Disease Claims, and Alzheimer's Disease, Memory, and Cognitive Performance Claims." *Id.* at 7. Section II concerns representations not already prohibited by Section I which state that any Covered Product: (A) causes weight loss; (B) causes fat loss; (C) treats or cures rheumatism, arthritis, or osteoarthritis; (D)

relieves joint pain, back pain, or muscle pain; (E) protects the brain against Alzheimer's disease or dementia; (F) reverses memory loss; (G) improves memory, concentration, or cognitive performance; or (H) "[c]ures, mitigates, or treats any disease." *Id.* at 8. The Judgment defines "Covered Products" as "any Dietary Supplement, Food, or Drug, including BioTherapex and NeuroPlus." *Id.* at 4. In addition to providing definitions of "Dietary Supplement," "Food," and "Drug," the Judgment specifies that "including" means "including but not limited to." *Id.* at 4–5. Representations covered by Section II are prohibited unless they are "non-misleading" and substantiated by human clinical testing that is "randomized, double-blind, . . . placebo-controlled," and conducted by qualified researchers. *Id.* at 8–9.

Section III, entitled "Prohibited Representations: Other Health-Related Claims," covers representations "about the health benefits, safety, performance, or efficacy of any Covered Product" beyond those representations already prohibited by Sections I and II of the Judgment. *Id.* at 9. Representations covered by Section III are prohibited unless they are "non-misleading" and are substantiated by competent and reliable scientific evidence, which is defined as:

> [T]ests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by experts in the relevant disease, condition, or function to which the representation relates; (2) that are generally accepted by such experts to yield accurate and reliable results; and (3) that are randomized, double-blind, and placebo-controlled human clinical testing of the Covered Product, or of an Essentially Equivalent Product, when such experts would generally require such human clinical testing to substantiate that the representation is true.

*Id.* at 9–10.

Additionally, Section IV prohibits certain misrepresentations about scientific evidence made in connection with any Covered Product, and Section VII prohibits

3

certain misrepresentations about endorsements of Covered Products. Finally, Section VIII prohibits seven specific misrepresentations made "in connection with the advertising, marketing, promotion, offering for sale, sale, or distribution of any good or service." *Id.* at 14.

The Plaintiffs contend that the Contempt Defendants violated Section II.H of the Judgment by making unsubstantiated claims that four products—Neupathic, Black Garlic Botanicals, BG18, and The Ultimate Heart Formula—cure, treat, or mitigate the following diseases: diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension. The Contempt Defendants respond that Section II.H was not intended to cover representations relating to diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension. In keeping with my procedural order dated April 8, 2020, I now address whether the scope of Section II.H is facially ambiguous.

## II. LEGAL STANDARD

When determining the scope of a consent decree such as the Judgment, courts apply "[o]rdinary contract principles." *Navarro-Ayala v. Hernández-Colón*, 951 F.2d 1325, 1339 (1st Cir. 1991). Disputed terms are read "in the context of the decree as a whole." *Quinn v. City of Boston*, 325 F.3d 18, 30 (1st Cir. 2003) (citing *Newport Plaza Assocs. v. Durfee Attleboro Bank*, 985 F.2d 640, 646 (1st Cir. 1993)). Courts consider the language contained within the "four corners" of the decree along with the circumstances surrounding its formation, any technical meaning the words used may have had to the parties, and any other documents expressly incorporated in the decree. *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 516−17 (1st Cir. 1996)

(citing *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) and *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975)). If the text of a decree is ambiguous, extrinsic evidence of the parties' intent may be considered to resolve the ambiguity. *See id.* at 519 (citing *Brennan v. Carvel Corp.*, 929 F.2d 801, 808 (1st Cir. 1991)); *Navarro-Ayala*, 951 F.2d at 1343 n.21. A consent decree is ambiguous if it is "susceptible to reasonable alternative interpretations." *Converse Inc. v. Reebok Int'l Ltd.*, 328 F. Supp. 2d 166, 176 (D. Mass. 2004) (citing *Sportfolio Publ'ns, Inc. v. AT & T Corp.*, 320 F.3d 75, 79 (1st Cir. 2003)).

Similarly, under Maine law, contracts are interpreted "in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument." *Dow v. Billing*, 224 A.3d 244, 249 (Me. 2020) (quoting *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 814 A.2d 989, 993 (Me. 2003)). "All parts and clauses must be considered together [so] that it may be seen if and how one clause is explained, modified, limited or controlled by the others." *Id.* (quoting *Am. Prot. Ins.*, 814 A.2d at 993). Ultimately, contracts are construed "to give effect to the plain meaning of the words used in the contract and avoid rendering any part meaningless." *Id.* (citing *Scott v. Fall Line Condo. Ass'n*, 206 A.3d 307, 311 (Me. 2019)). If a contract "contains an ambiguity that cannot be resolved from the four corners of the document, the interpretation of the ambiguous language becomes a question for the fact-finder to resolve by taking extrinsic evidence." *Id.* (citing *In re Estate of Barrows*, 913 A.2d 608, 613 (Me. 2006)). Contractual language is ambiguous if it is "reasonably

susceptible of different interpretations." *Williams v. Williams*, 161 A.3d 710, 713 (Me. 2017) (quoting *Am. Prot. Ins.*, 814 A.2d at 993).[1]

The determination of facial ambiguity is "particularly important" in a civil contempt proceeding. *Converse Inc.*, 328 F. Supp. 2d at 176. "Civil contempt may be imposed to compel compliance with a court order or to compensate a party harmed by non-compliance." *United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). "To prove civil contempt, a movant must show that (1) the alleged contemnor had notice of the order, (2) 'the order was clear and unambiguous,' (3) the alleged contemnor 'had the ability to comply with the order,' and (4) the alleged contemnor violated the order." *Hawkins v. Dep't of Health & Human Servs.*, 665 F.3d 25, 31 (1st Cir. 2012) (quoting *Saccoccia*, 433 F.3d at 27). When evaluating whether a court order is "clear and unambiguous," the question is "not whether the order is clearly worded as a general matter." *Saccoccia*, 433 F.3d at 28. Instead, the "clear and unambiguous" prong "requires that the words of the court's order have clearly and unambiguously forbidden the precise

---

[1] The parties cite Maine law to identify the applicable principles of contract interpretation. Several circuits and some district courts in the First Circuit have applied state contract law when interpreting consent decrees such as the Judgment. *See, e.g.*, *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019), *cert. denied*, No. 19-1079, 2020 WL 2515510 (U.S. May 18, 2020); *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008); *Collins v. Thompson,* 8 F.3d 657, 659 (9th Cir. 1993); *NAACP v. Donovan*, Civil Action No. 78-850-DPW, 2009 WL 792301, at *11 (D. Mass. Mar. 17, 2009). The First Circuit has not explicitly opined on whether the relevant contract principles derive from state law or federal law, but it has consistently applied federal-law precedents when determining the scope of consent decrees. *See, e.g.*, *Quinn*, 325 F.3d at 30; *Charter Int'l*, 83 F.3d at 516−19; *Lamphere v. Brown Univ.*, 875 F.2d 916, 920−21 (1st Cir. 1989); *see also Equova Water*, 940 F.3d at 236−45 (Bush, J., concurring) (persuasively advocating for the federal-law approach). Even under the federal-law approach, however, state law can provide useful guidance. *See Equova Water*, 940 F.3d at 243 (Bush, J., concurring). Additionally, the contract principles set forth in the precedents of both the First Circuit and the Maine Law Court are substantially equivalent. For these reasons, I consider both state and federal precedents in determining whether the Judgment is facially ambiguous.

conduct on which the contempt allegation is based." *Id.* (emphasis omitted) (citing *Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003)). Indeed, the language of the order must leave "no reasonable doubt" that the allegedly contumacious conduct is prohibited. *Id.* (quoting *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991)).

Because there is significant overlap between the question of whether Section II.H of the Judgment is facially ambiguous under ordinary principles of contract interpretation and the question of whether Section II.H, on its face, clearly and unambiguously prohibits the Contempt Defendants' allegedly contumacious conduct, this Order addresses both questions.[2]

### III.  DISCUSSION

The Plaintiffs contend that the Contempt Defendants violated Section II.H by making unsubstantiated claims that four Covered Products—Neupathic, Black Garlic Botanicals, BG18, and The Ultimate Heart Formula—cure, treat, or mitigate the following diseases: diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension. Section II.H of the Judgment prohibits representations that any Covered Product "cures, mitigates, or treats any disease" unless the representations are non-misleading and substantiated by human clinical testing that is randomized, double-blind, placebo-controlled, and conducted by qualified researchers, as outlined above.  ECF No. 15 at 8.

---

[2] This Order does not finally determine whether Section II.H "clearly and unambiguously" prohibited the "precise conduct" on which the Plaintiffs' contempt allegations are based. *Saccoccia*, 433 F.3d at 28. At the conference of counsel held on April 8, 2020, the Plaintiffs suggested that, in their view, extrinsic evidence is admissible in the civil contempt proceeding for the purpose of determining whether Section II.H is clear and unambiguous. If the Plaintiffs intend to press this argument, they shall inform the Court at the next conference of counsel, to be scheduled by the Clerk of Court, and the Court will set a briefing schedule on the admissibility of extrinsic evidence for this purpose.

7

The Plaintiffs assert that the phrase "any disease" in Section II.H, on its face, clearly and unambiguously encompasses all diseases, including diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension. The Plaintiffs' argument comports with the plain meaning of the phrase "any disease." This is powerful evidence supporting the Plaintiffs' interpretation, but it is not dispositive on its own: I must read Section II.H "in the context of the [Judgment] as a whole," not in isolation. *Quinn*, 325 F.3d at 30 (citing *Newport Plaza Assocs.*, 985 F.2d at 646).

The Contempt Defendants assert that Section II.H, on its face, does not clearly and unambiguously prohibit representations relating to diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension. Rather, the Contempt Defendants contend that the phrase "any disease" in Section II.H encompasses only diseases involving or relating to weight loss, joint disease, Alzheimer's disease, memory, and cognitive decline. They argue that the Plaintiffs' broad interpretation of the phrase "any disease" is unsupported by the purpose, structure, and text of the Judgment as a whole. I evaluate each of the Contempt Defendants' arguments in turn.

**A.   Purpose**

The Judgment's stated purpose was "to resolve all matters in dispute in this action between them, including the allegations in the Complaint." ECF No. 15 at 2. The Judgment thus sought to resolve the complaint's allegations that Duhon and Health Research Laboratories violated state and federal law in connection with the "labeling, advertising, marketing, distribution, and sale of products purported to

8

cause weight loss, treat arthritis, relieve joint and back pain, and prevent or mitigate cognitive decline." *Id*. As such, the Contempt Defendants assert that the Judgment was only intended to prohibit representations relating to weight loss, arthritis, joint and back pain, and cognitive decline.

Contrary to the Contempt Defendants' argument, the Judgment as a whole reflects an intent to enjoin conduct beyond the conduct alleged in the complaint. For example, although the complaint's allegations related primarily to the products BioTherapex and NeuroPlus, Section I of the Judgment prohibits certain representations relating to "any Dietary Supplement, over-the-counter Drug, patch, cream, wrap, or other product worn on the body or rubbed into the skin." *Id*. at 6. Similarly, Sections II, III, IV and VII enjoin certain representations relating to "any Covered Product," which is defined as "any Dietary Supplement, Food, or Drug," including but not limited to BioTherapex and NeuroPlus. *Id*. at 4, 7, 9, 10, 13; *see also id*. at 5 (defining "including" as "including but not limited to"). Further, Section VIII prohibits certain misrepresentations relating to "any good or service," which plainly encompasses a broader scope of representations than those alleged in the complaint. *Id*. at 14.

Additionally, although the Judgment characterized the complaint's allegations as related to representations about certain products' ability to "cause weight loss, treat arthritis and relieve joint and back pain, and prevent or mitigate cognitive decline," *id*. at 2, the Judgment as a whole encompasses representations about other health benefits and conditions as well. For example, Section III prohibits "any representation about the health benefits, safety, performance, or efficacy of any

9

Covered Product," unless the representation is non-misleading and substantiated by competent and reliable scientific evidence. *Id.* at 9. Further, Section IV.B enjoins misrepresentations that "the performance or benefits of any Covered Product are scientifically or clinically proven or otherwise established," *id.* at 10, and Section IV.C prohibits misrepresentations about the "existence, contents, validity, results, conclusions, or interpretations of any test, study, or other research," *id.* at 11. Sections VII and VIII similarly enjoin certain misrepresentations regardless of whether the representations relate to weight loss, arthritis, joint and back pain, or cognitive decline.

Because the text of the Judgment plainly enjoins a broader scope of conduct than the conduct alleged in the complaint, the Plaintiffs' interpretation of Section II.H to encompass diseases beyond those discussed in the complaint is consistent with the purpose of the Judgment.

**B.   Structure**

The Contempt Defendants further assert that the Plaintiffs' broad interpretation of the phrase "any disease" in Section II.H is inconsistent with the structure of the Judgment because it would render Section III's prohibition on "Other Health-Related Claims" redundant and therefore meaningless. However, Section III prohibits a broader swath of representations than Section II.H: Section III prohibits misleading or unsubstantiated representations about "the health benefits, safety, performance, or efficacy of any Covered Product," *id.* at 9, whereas Section II.H prohibits only misleading or unsubstantiated representations that any Covered Product "[c]ures, mitigates, or treats any disease," *id.* at 8. As such, Section III

10

retains legal force and effect even if the phrase "any disease" is interpreted to include all diseases, as the Plaintiffs suggest. Further, Section III specifies that it pertains only to the representations not already covered under Sections I and II. Accordingly, Sections II and III are not duplicative even if Section II.H is interpreted broadly.[3]

The Contempt Defendants object that at least portions of Section III would be rendered nonsensical by an expansive interpretation of Section II.H because Section III contains the word "disease," which would not be appropriate if Section II.H covers representations relating to any and all diseases. However, Section II.H covers only representations that a Covered Product "[c]ures, mitigates, or treats" a disease. *Id.* at 8. It is plausible that at least some disease-related representations—such as representations that a Covered Product prevents a certain disease—would not fall within the ambit of Section II.H. Further, it is likely that any disease-related representations not covered by Section II.H would fall within the scope of Section III. Thus, there is no inconsistency between Section III of the Judgment and a broad interpretation of the phrase "any disease" in Section II.H.

---

[3] The Plaintiffs assert that the canon against surplusage—the principle that courts should avoid interpretations that render terms in a contract redundant—is only relevant when resolving ambiguity, not when determining whether a disputed term is ambiguous. The Plaintiffs rely on *Ardente v. Standard Fire Ins. Co.*, 744 F.3d 815, 819 (1st Cir. 2019). However, *Ardente* discusses redundancy only in the specific context of insurance policies, and it acknowledges that in general, "redundancy may itself be a form of ambiguity." *Id.* Some authorities on contract interpretation similarly suggest that the canon against surplusage is relevant to the initial determination of ambiguity. *See* 11 Samuel Williston & Richard A. Lord, Williston on Contracts § 32:5 (4th ed. 1990) (classifying the canon against surplusage as a "primary rule" to be referenced when determining ambiguity); *see also OfficeMax Inc. v. Sousa*, 773 F. Supp. 2d 190, 216 (D. Me. 2011) (applying the canon against surplusage when discussing contractual ambiguity); *Dow*, 224 A.3d at 251 (citing *Estate of Barrows*, 913 A.2d at 611) (same). In any event, I am unpersuaded by the Contempt Defendants' arguments relating to the canon against surplusage, as discussed above.

**C.     Text**

As mentioned above, the Plaintiffs' interpretation of the phrase "any disease" in Section II.H as encompassing all diseases is consistent with the plain meaning of Section II.H.  However, the Contempt Defendants contend that the Plaintiffs' interpretation is inconsistent with the text of Section II as a whole, including the section heading.[4]

Section II's heading lists three specific categories of "Prohibited Representations": (1) "Other Weight-Loss Claims," i.e., weight-loss claims not already covered by Section I, (2) "Joint-Related Disease Claims," and (3) "Alzheimer's Disease, Memory, and Cognitive Performance Claims." *Id.* at 7.  Each category corresponds to certain representations prohibited by Sections II.A–G.  For example, the "Other Weight-Loss Claims" referred to in the heading correspond to Section II.A and II.B, which prohibit misleading or unsubstantiated representations that any Covered Product causes weight loss or fat loss.  *Id.*  Similarly, "Joint-Related Disease Claims" correspond to Sections II.C and II.D, which prohibit misleading or unsubstantiated representations that any Covered Product "[t]reats or cures rheumatism, arthritis, or osteoarthritis" or "[r]elieves joint pain, back pain, or muscle pain." *Id.* at 8.  Finally, "Alzheimer's Disease, Memory, and Cognitive Performance Claims" correspond to Sections II.E, II.F, and II.G, which prohibit misleading or unsubstantiated

---

[4] The Plaintiffs contend that section headings are relevant only when resolving ambiguity, not when determining whether a contract term is ambiguous.  However, the Plaintiffs rely on authorities discussing statutory interpretation, not contract interpretation.  Although there is some overlap between principles of statutory interpretation and principles of contract interpretation, I am persuaded by the Defendants' argument that the section headings are part of the whole document that I must consider.  *See* Williston & Lord, Williston on Contracts § 32:5; 5 Margaret N. Kniffin, Corbin on Contracts § 24.21(A)(15) (1993 ed.).

representations that any Covered Product "protects the brain against Alzheimer's disease or dementia," "reverses memory loss," or "improves memory, concentration, or cognitive performance." *Id.* None of the three specific categories listed in the section heading corresponds directly to Section II.H, which prohibits misleading or unsubstantiated representations that any Covered Product "[c]ures, treats, or mitigates any disease."

As the Contempt Defendants contend, the Plaintiffs' broad interpretation of Section II.H is not consistent with the entire text of Section II. Interpreting the phrase "any disease" in Section II.H as encompassing all diseases would render the section heading underinclusive: The section heading enumerates the categories of representations prohibited by Sections II.A−G but does not account for the broad category of representations that would be prohibited by an expansive reading of Section II.H. Relatedly, interpreting Section II.H expansively would render the section heading misleading because the heading tends to suggest that the scope of Section II is limited to representations regarding the enumerated health benefits and diseases and does not encompass representations regarding other diseases.

The Contempt Defendants offer an alternative interpretation of Section II.H which avoids these inconsistencies. Under the Contempt Defendants' interpretation, the phrase "any disease" in Section II.H would encompass only diseases involving or relating to the health benefits and diseases enumerated in Section II's heading—i.e., diseases involving or relating to weight loss, joint disease, Alzheimer's disease, memory, and cognitive decline. The text of Section II provides some support for this interpretation. The close correspondence between the categories in Section II's

13

heading and the contents of Sections II.A−G suggests that the parties intended to delineate the scope of Section II somewhat specifically in the section heading. As such, the absence of a category corresponding to Section II.H in the section heading could be taken to mean that Section II.H was not intended to expand the scope of Section II. In other words, Section II.H reasonably could be interpreted as a catch-all provision, covering disease-related representations within the scope of Section II's heading that were not specifically contemplated in Sections II.A−G.[5]

### D.     Conclusion as to Facial Ambiguity

The Plaintiffs' interpretation of Section II.H to encompass representations relating to all diseases—including diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension—is supported by the plain text and the broad purpose of the Judgment. However, the Contempt Defendants' narrower interpretation of Section II.H—which does not encompass representations relating to diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension—is also reasonable in light of Section II's heading. Because Section

---

[5] The Defendants raise two additional arguments based on the text of Section II, but both are unpersuasive. First, the Defendants assert that the Plaintiffs' interpretation of Section II.H is inconsistent with the text of Section II because it would render Section II.C redundant. However, the Defendants' proposed interpretation would have the same effect. Thus, any potential redundancy in Section II.C is not relevant to my analysis.

Second, the Defendants assert that the scope of Section II.H is limited by Sections II.A−G under the interpretive principle known as *ejusdem generis*, which provides that "the meaning of a general term in a contract is limited by accompanying specific illustrations." Kniffin, Corbin on Contracts § 24.28. Although Section II.H contains the general phrase "any disease," Sections II.A−G cannot be fairly characterized as accompanying specific illustrations of that phrase. For example, Sections II.A, II. B, II.D, and II.G cover representations about a Covered Product's ability to "cause[] . . . weight loss," "cause[] . . . fat loss," "relieve[] joint pain, back pain, or muscle pain," and "improve[] memory, concentration, or cognitive performance," respectively. ECF No. 15 at 7−8. Although these representations could be disease-related in some contexts, they could also appear in contexts unrelated to any disease. Thus, I conclude that the principle of *ejusdem generis* does not assist in the interpretation of Section II.H. Accordingly, I need not resolve the Plaintiffs' additional arguments regarding *ejusdem generis*.

II.H is susceptible to reasonable alternative interpretations, I conclude that it is facially ambiguous. Accordingly, I also conclude that Section II.H does not, on its face, clearly and unambiguously cover representations relating to diabetes, diabetic neuropathy, cardiovascular disease, atherosclerosis, and hypertension, which form the basis for the Plaintiffs' contempt allegations.

## IV.  CONCLUSION

For the foregoing reasons, I conclude that Section II.H of the Judgment is facially ambiguous and does not, on its face, clearly and unambiguously prohibit the Contempt Defendants' allegedly contumacious conduct. In keeping with my Order dated April 8, 2020, it is **ORDERED** that the Clerk shall schedule a video status conference to establish the framework by which the pending motions will be addressed.

SO ORDERED.

Dated:  July 31, 2020

                                                                                                              /s/ JON D. LEVY  
                                                                                                **CHIEF U.S. DISTRICT JUDGE**